[No. 33211. Department One. November 17, 1955.]

MARY D. HENSON, *Respondent*, v. WILLIAM L. HENSON, *Appellant*.

MARY D. PARTEE, *Respondent*, v. WILLIAM L. HENSON, *Appellant*.[1]

'Reported in 289 P. (2d) 1034.

*Medley & Haugland,* for appellant.

*Peterson & Vogel,* for respondent.

DONWORTH, J.—This appeal brings before this court for review judgments entered in cause No. 427905, King county (custody action), and cause No. 470387, King county (property action). These two cases and an additional (or third) cause, all touching and concerning a divorce decree and property settlement agreement, had been consolidated for trial. No appeal has been taken from the judgment entered in the third cause. We shall discuss first the custody action, and then the property action. William L. Henson, who is referred to herein as appellant, is the former husband of Mary D. Henson (now Partee). She will be referred to herein as respondent.

On November 14, 1951, respondent was granted a divorce from appellant. The divorce decree approved and confirmed a property settlement agreement made between the parties which, by paragraph three, *infra,* also provided for the custody of the two minor children of the parties. Paragraph three reads as follows:

"IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the plaintiff be and she is hereby awarded the care, custody and control of the minor children of the parties hereto, . . . [naming them] and the defendant is hereby granted the right of visitation at reasonable and suitable times, and further custody rights of the children each weekend during the school year from Friday afternoon after school to Sunday evening, and for a period not in excess of forty-five (45) days during the summer school vacation, and for alternate yearly holidays . . . [naming them] provided, however, that the defendant has adequate living quarters in which to accommodate the children; . . ."

On June 24, 1954, respondent filed a petition seeking modification of the custody provisions of the divorce decree

" . . . so as to award to petitioner the sole custody of the children . . . and so as to eliminate the right of de-

fendant to have the children with him and at his residence over the weekends; . . ."

Appellant's answer to this petition set forth affirmative matter and prayed that the court (a) dismiss the petition, and (b) enter an order

". . . modifying the Decree of Divorce and granting to the defendant the permanent care, custody and control of the two minor children of the parties, subject only to reasonable rights of visitation in the plaintiff, . . ."

The evidence shows that since the divorce of the parties each has remarried (appellant has two children by his second marriage, but respondent states she will be unable to have any more children); that respondent, who at the time of the divorce was addicted to the excessive use of intoxicating liquors, has reformed, and now totally abstains therefrom; that the children of the parties, a boy aged thirteen and a girl aged eleven, stated to the trial judge in a private interview that they would prefer to live in one home, but were not asked to indicate a preference in the choice of homes; that the emotional, social, and disciplinary problems arising because of the twice weekly change of homes caused friction and discord between the parents and the children. The daughter appeared to the court to be the better adjusted of the two children, but the trial judge felt that the son suffered from a sense of insecurity, manifested by his conduct and behavior.

Early in the trial, the court announced its position that the welfare of the children made it mandatory that the custody provisions be modified. The court, in its oral opinion, elaborated on its position as follows:

"It seems to me that this case, when you boil it right down to its essentials, comes back to the normal situation with which we are ordinarily faced in divorce cases, that unless there are overriding reasons for believing that the mother is unfit to have the children, she is the one who should be favored.

"It is not a matter of the parents' rights. I think we make a mistake sometimes when we talk in terms of the parent's right to have the child. It is a misnomer. It is misleading. It is a misconception. The only rights involved are the chil-

dren's rights. It isn't as if you are deciding who is going to have the use of the family car five days a week and who is going to have the use of the family car the other two days a week. We are dealing with the rights of the children to have as nearly as possible a normal, happy, unified family life."

Findings of fact and a conclusion of law were made and pursuant thereto an order, modifying paragraph three of the divorce decree, was entered which awarded to respondent

" . . . the sole care, custody and control of the minor children of the parties hereto . . . with complete visita· tion privileges to the defendant."

Appealing from this determination of the matter, appellant assigns error (assignment No. 1) to finding of fact No. IV, which reads:

"That since entry of the Decree of Divorce herein on November 14, 1951, there have been substantial and material changes in the conditions and attitudes of the parties and the children which require a modification of the custody provisions for the welfare of the children, and that such welfare requires that petitioner herein be given their sole custody."

Error is also assigned (No. 2) to the conclusion of law made, and (No. 3) to the entry of the above quoted order of modification.

"Appellant contends that there has been no change in conditions since the entry of the divorce decree which justify modification of that decree with respect to the custody of the children and that the trial court abused its discretion in ordering such a modification." (Appellant's opening brief, p. 33.)

The basis of appellant's theory as expressed in his briefs and upon oral argument is that a custody decree cannot be modified unless a change in the fitness of a party is shown to have occurred. This contention, strictly speaking, is not correct.

"The question of the power of the court to modify a custody order has been before this court on many occasions, and we have adopted the rule that the court has such power when (a) there has been a material change in the conditions

or fitness of the parties, or (b) the welfare of the children would be promoted thereby." *Wilcox v. Wilcox*, 32 Wn. (2d) 633, 203 P. (2d) 328.

Respondent's petition alleges facts showing that there has been a change of conditions since the entry of the original decree in relation to the care, custody, and control of the minor children of the parties, and that the superior court had jurisdiction of the cause. RCW 26.08.160 and 26.08.170.

The paramount concern of the courts, in such a proceeding, is the welfare of the children. *Joslin v. Joslin*, 45 Wn. (2d) 357, 274 P. (2d) 847. Trial courts must necessarily be allowed a broad discretion in child custody matters. *Chatwood v. Chatwood*, 44 Wn. (2d) 233, 266 P. (2d) 782. This court, in reviewing a decree awarding or altering the custody of the children of a divorced couple, will accord great respect to the trial court's determination in the matter and will not overrule its decree in the absence of a clear showing of an abuse of discretion. *Joslin v. Joslin*, *supra*.

Appellant relies heavily upon the cases of *Ramsden v. Ramsden*, 32 Wn. (2d) 603, 202 P. (2d) 920, and *Eickerman v. Eickerman*, 42 Wn. (2d) 165, 253 P. (2d) 962, in support of its theory that the court abused its discretion in modifying the custody provisions of the divorce decree. The argument in this respect is briefly stated on page 43 of appellant's opening brief, as follows:

"Thus, it is respectfully submitted, that in light of the *Eickerman* and *Ramsden* cases, it is readily apparent that the respondent's reform, her discontinuation of the excessive use of alcohol, is not such a change as *requires* a modification of the divorce decree." (Italics ours.)

We find no mention in the record, by the trial court, that the change referred to above *required* a modification of the custody provisions. The record does show many instances where the court, basing its opinion upon the evidence of the events occurring during the three years of the divided custody, said *that the future welfare of the children required that the custody provisions be modified* in such a manner as would terminate the divided custody and delegate to but one person the responsibility for the custody of

the children. The court reached this conclusion without any reference whatever to the respondent's reform. The only time that the court took into consideration the change or reform in respondent's conduct was when it was considering in whom the custody of the children should be placed. At that time, the court found that, by virtue of her reform, respondent was a fit and proper person to be entrusted with the care and custody of the minor children. Upon the record before us, we can find no abuse of discretion by the court in its determination that the then existing custody provisions required modification, nor in modifying the divorce decree in the manner stated above. The decree of modification is affirmed.

The facts giving rise to the "property action" are as follows: Appellant is a bricklayer by trade, and during the late war he became a mason contractor and then a general contractor. As a contractor, he engaged in "joint ventures" with other contractors and builders. Generally, appellant enjoyed business success, but some of the undertakings of these "joint ventures," however, resulted in failure and financial loss. At the time of the divorce, he (as a joint venturer) was threatened with a damage suit in connection with the construction of Grosvenor House in Seattle, which had been undertaken for the Kellerblock Corporation. His partner in one of the joint ventures failed to complete the project and became financially insolvent. Appellant had to respond upon his bond on the project. The various provisions of the property settlement agreement were drafted to cope with the unstable condition of appellant's (and the community's) financial circumstances at the time of the divorce action.

At that time, appellant and respondent, as a community, owned an improved lot located at 127 north Thirty-fifth street, Seattle. The main building on this lot was used as an office building, and served as the headquarters for appellant's operations and of the "joint ventures." His accountant worked in this building, and all business records were kept there.

Appellant describes the condition of his business affairs as of the time of the divorce as follows:

"The former marital community of which appellant was the manager was one of two parties to a joint venture which had contracted with the Kellerblock Corporation to build the Grosvenor House in the City of Seattle. . . . At the time of the property settlement agreement, the Grosvenor House was almost completed and the sale of the stock of that corporation was contemplated. However, it was also known that the appellant would have to make adjustments in the closing out of the contract with the corporation. The appellant had suffered great losses incident to this construction. The Kellerblock Corporation was threatening suit for approximately $200,000.00 . . . Other claimants were appearing so fast that no one knew the exact state of the account." (Appellant's opening brief, pp. 62-3.)

The community owed many accounts on other construction projects. The total of these liabilities were known, but at the time of the drafting of the property settlement agreement, it was anticipated that when these accounts were actually paid certain savings might be effected by way of discounts or settlements. The possibility of additional demands against, and liabilities of, the community later becoming known, was also anticipated.

The pertinent paragraphs of the property settlement agreement are as follows:

"6. The plaintiff [respondent here] shall have and receive, as her sole and separate property, an undivided one-half interest in that certain land and office building, including all the furnishings, furniture and fixtures now located therein, located at 127 North 35th Street, Seattle, . . . [legal description deleted].

"Both parties agree that within two years from the date hereof the above described real and personal property shall be appraised and one-half of the appraisal price shall be paid by the defendant [appellant here] to the plaintiff, or the property shall be sold and the proceeds thereof equally divided between the said parties.

"8. The plaintiff shall have and receive, as her sole and separate property, an undivided one-half interest, subject to a charge as hereinafter provided, in those certain shares of stock owned by William L. Henson, Mary Henson and Walter F. Harfst, in the Kellerblock Corporation, a Wash-

874

ington corporation, provided that the proceeds of the sale of said stock shall be first applied to attorneys' fees over and above $5,000.00, or any other costs or expenses necessarily incurred in regard to said stock, and to any and all claims against William L. Henson, Mary Henson and Walter F. Harfst, on behalf of or in connection with the Kellerblock Corporation, before the said proceeds are distributed equally between the parties. . . .

"9. The plaintiff shall have and receive, as her sole and separate property, an undivided one-half interest in any savings effected by William L. Henson [appellant] in negotiating the settlement of the claims owed by the community arising out of the following joint ventures: [naming them] in the approximate amount of $52,000.00 in outstanding claims, the exact list of which is to be furnished by Henry L. Benson. The defendant agrees to make an accounting to the plaintiff of the above described claims, when all such claims are settled, and in any event not later than December 31, 1952.

"13. The defendant shall forthwith pay to the firm of . . . [attorneys] attorneys' fees in the amount of . . . [$5,000.00] for services performed in connection with this proceeding and all other transactions in the past; and the defendant shall be permitted to deduct these sums from, and they shall be a charge upon, the proceeds resulting from the sale of the Kellerblock Corporation stock as referred to in Paragraph 8 of this agreement, and from the sale or from the appraised value of the property as referred to in Paragraph 6 of this agreement, before the balance of the proceeds of such sale or sales, or of such appraised value, shall be divided equally between the parties hereto.

"14. The defendant shall be held liable for any claims, debts, liabilities or causes of action arising from any source or any transaction heretofore incurred by the community composed of the plaintiff and defendant. The defendant shall exhaust his assets first to satisfy any such liabilities or claims, and the assets which must be first applied to satisfy any of the above claims or liabilities shall include all of his present assets, plus the profits he may earn from the contracts listed . . . [on a certain Report of Financial Condition, which is not in the record of these cases].

"19. The plaintiff and defendant agree to execute any and all necessary instruments to carry out the purport and intent of this agreement."

Parenthetically, the "third action" (from which no appeal was taken), mentioned in the first paragraph of this opinion, was commenced by respondent to recover her one half of the savings effected in the settlement and payment of the claims mentioned in paragraph 9.

The record is not clear as to the exact date, but presumably it was in April, 1953, that the contemplated sale of Kellerblock stock was accomplished, the threatened lawsuit was settled or dropped, and that corporation, as a final settlement on that contract, paid to appellant $38,086.82, which sum was deposited in a special bank account. In the same month, appellant and respondent (both having the services of attorneys and accountants) divided the funds of this special bank account as provided in paragraph 8. Before this fund was divided, appellant was allowed credit for five thousand dollars attorneys' fees paid in accordance with paragraph 13, and for $5,568.51 (accountant's fees, reporter's fees for depositions, contractors' association dues, and city and state business taxes), which he has paid as "other costs or expenses necessarily incurred in regard to said stock" under paragraph 8. The remainder of the fund, after the allowance of these credits, was divided equally between appellant and respondent, each receiving $13,-759.16.

On June 2, 1954, respondent commenced this action—the property action—by filing a complaint praying for recovery of certain sums due her as her one-half interest in the office building referred to in paragraph 6 of the property settlement agreement. As issue was joined in this case, the ultimate question for the court's determination (and of vital importance on appeal) was whether appellant be allowed to set off against the sum payable to respondent as the value of her one-half interest in the lot and office building, certain sums which appellant claims to have paid on her account. The trial court refused to allow the set-off of the four items claimed. Appeal is taken from the judgment awarding respondent a money judgment in the amount of one half of the appraised value of the building, and error is assigned to

the denial of each claimed set-off and to the failure of the court to include in the judgment a provision requiring respondent to deed her interest in the property to appellant upon satisfaction of the judgment.

By virtue of the terms of paragraph 6 of the property settlement agreement, the parties became as tenants in common with regard to the property, both real and personal, therein described. Appellant has occupied the building for business purposes continuously since the entry of the divorce decree.

From the date of the divorce (November, 1951) until the settlement of the "Kellerblock" interest pursuant to paragraph 8 (April, 1953), respondent must be held to have also occupied and used the premises. This holding is based upon the fact that during that period all of the records, books, and accounts of the Kellerblock project were housed therein, and respondent's attorneys, accountants, and auditors availed themselves of these records and premises in effecting the settlement with the Kellerblock Corporation, and also in effecting the settlement between the parties on the proceeds of the Kellerblock contract. Since April, 1953, when these proceeds were divided between the parties, appellant has had the sole and exclusive use and occupancy of this real property. He has not paid his cotenant any rent for such occupancy.

The minimum amount testified to as being the fair rental value of the premises is now, and has been for some time past, seventy dollars per month. Appellant has paid the taxes on this real property for the years 1952, 1953, and 1954, and now seeks to set off one half of the taxes so paid against the respondent's interest in the property. The trial court refused to allow respondent any recovery for rent during the period of appellant's exclusive occupancy, and, since no rent was allowed, appellant was not allowed the tax payments as set-offs.

While the finding pertinent to this issue (assignment No. 1) might have been phrased in more comprehensive language, its effect is not prejudicial to appellant. The

party actually benefiting from this finding is appellant, because the amount of the rent item for the period he had the exclusive use of the premises exceeds the amount of tax payments. If rent had been allowed respondent, and the tax payments set off against this charge, the rent payable to respondent would have exceeded, by approximately three hundred dollars, the tax payment set-off. The finding, thus operating to appellant's benefit, is not a basis for a claim of error. *O'Connor v. Tesdale*, 34 Wn. (2d) 259, 209 P. (2d) 274.

Assignment of error No. 2 complains of the entry of finding of fact No. V. In this finding, the trial court found that the three other claimed offsets (which were not allowed)

" . . . arose out of the so-called Kellerblock settlement, as the same was referred to in paragraph 8 of the Property Settlement Agreement; that a separate settlement in relation to all of the Kellerblock matters was effected in April, 1953, and all of said items, of which an offset is now claimed, were within the contemplation of the parties at that time and said settlement constituted an accord and satisfaction in relation to all of said claims and counterclaims [relating to the Kellerblock matters] between the parties."

Appellant seeks to establish his contention that the division of the bank account consisting of the proceeds of the Kellerblock project was not an accord and satisfaction by his own testimony to the effect that, at that meeting, where both parties were represented by counsel, respondent's then attorney stated to appellant that the parties can take care of and adjust the "pros and cons" at a later date. He argues in his brief that the failure of respondent to take the stand and rebut his testimony must be construed as supporting his contention.

We do not agree with this argument. In the first place, it was not shown that respondent had any knowledge of this alleged statement of her attorney, and, second, appellant has failed to come forth with any explanation whatsoever as to why he did not call this attorney as a witness to establish such a fact so vital to his claim of set-off.

The trial court is in a better position to judge the credibility of the witnesses and to determine the weight to be accorded their testimony than is this court. We cannot say, from a review of the record, that the evidence preponderates against the facts found in finding of fact No. V. We must, therefore, accept them as verities. The fact that we might have achieved a result identical with finding No. V, but for different reasons, is not in itself sufficient basis to hold the finding as being in error.

While the property settlement agreement requires, in paragraph 19, that the parties execute all instruments required to fulfill the intent and purpose of the agreement, appellant contends that, since the judgment entered did not require respondent to convey her interest in the office property upon satisfaction of the money judgment entered, there exists the possibility that appellant, at some later date, might have to bring an action to quiet title. Respondent's counsel, on oral argument, stated that, while he thought that paragraph 19 of the agreement was sufficient basis to compel respondent to deed her interest to appellant upon satisfaction of the judgment, respondent would give a deed of her interest, if demanded, at the time of payment of the judgment. In order to eliminate the possibility of future litigation regarding this matter, we see no reason why the judgment in this case should not be so modified.

In view of the conclusions we have reached in this opinion, seven assignments of error in the custody action and seven assignments of error in the property action, all of which relate to the trial court's rejection of appellant's proposed findings, conclusions, and decree or judgment, do not warrant separate and specific mention. We have, however, considered and discussed herein all the other issues raised by appellant.

Decree in the custody action is affirmed. Judgment in the property action is modified by inserting therein a provision requiring respondent to quitclaim her interest in the office property to appellant upon his payment of the judgment

rendered herein. As so modified, that judgment is affirmed. Respondent will recover her costs in this court.

HAMLEY, C. J., SCHWELLENBACH, FINLEY, and OTT, JJ., concur.